UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| OMARRION JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JENNIFER HOFFMAN; CATHERINE | ) | No. 19 C 50342 |
| LARRY, in her official capacity as Warden | ) | |
| of Joliet Treatment Center; RAYMOND | ) | Judge Rebecca R. Pallmeyer |
| MARQUEZ; and WEXFORD HEALTH | ) | |
| SOURCES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Omarrion Jones ("Plaintiff" or "Jones") is a prisoner currently in the custody of the Illinois Department of Corrections ("IDOC"). Jones, who identifies as "bigender or nonbinary," claims to suffer from depression, attention deficit hyperactivity disorder ("ADHD"), and gender dysphoria. In this lawsuit, brought under 42 U.S.C. § 1983, Jones alleges Wexford Health Sources, the third-party company responsible for healthcare at the prison, and two individual providers, Dr. Raymond Marquez[1] and Nurse Practitioner Jennifer Hoffman, were deliberately indifferent to Jones's mental illnesses in violation of the Eighth Amendment of the U.S. Constitution. Specifically, Jones claims that Jones has been subjected to cruel and unusual punishment as a result of Defendants' (1) decision to force Jones to take antipsychotic medications; (2) failure to provide a prescription for Wellbutrin, an antidepressant; (3) failure to treat gender dysphoria; and (4) failure to prescribe a medication for attention deficit hyperactivity disorder. Defendants have moved for summary judgment in two separate motions [263, 267]. As explained below, the motions are granted.

---

[1] The court notes that Dr. Marquez is named as "Raymond Marquez" on the docket and in the operative complaint (e.g., Am. Compl. [98] ¶ 11), but Defendants' summary judgment briefing suggests his name is "Ramon Marquez." (Def. Mem. [289] at 4.)

## BACKGROUND

The facts laid out below are taken primarily from the parties' respective Local Rule 56.1 statements, as well as the record evidence produced by the parties.[2] As required at this stage, the court takes contested facts in the light most favorable to Plaintiff, the non-moving party, and draws all reasonable inferences in Plaintiff's favor. *See Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016). At the outset, the court notes that Plaintiff's counsel has informed the court that Plaintiff's preferred name is "Innocent Man" (or "I.M." for short), and that Plaintiff has disavowed the use of all pronouns. (*See* PSOF [283] ¶ 2; Pl. Resp. to DSOF [279] ¶ 9.) The court declines to adopt Plaintiff's desired "Innocent Man" moniker in light of Plaintiff's criminal convictions, but will eliminate pronouns where possible and refer to Plaintiff solely as "Plaintiff" or "Jones." The factual description is lengthy, but reviewed here in detail, because the detailed history defeats any finding of deliberate indifference on the part of Plaintiffs' medical or mental health providers.

## I.     Factual Background

### A.      Plaintiff's Background

Since 2012, Jones has been serving a life sentence in the custody of the State of Illinois. (PSOF [280] ¶ 1.) In 2014, Plaintiff was prescribed the prescription drug Wellbutrin by a physician at Stateville Correctional Center for attention deficit hyperactivity disorder ("ADHD"). (*Id.* ¶ 5.) According to Dr. Prudence Gourguechon,[3] Plaintiff's expert witness, Wellbutrin is a "stimulant antidepressant that is sometimes used off-label for treating ADHD." (Gourguechon Rep. [280-2] at 8.) Dr. Gourguechon explained that ADHD is a condition characterized by symptoms including

---

[2]     (*See* Wexford Defs. LR 56.1 Statement of Material Facts ("DSOF") [265]; Pl. LR 56.1(B)(3) Statement of Additional Material Facts ("PSOF") [280]; Plaintiff's Response to Wexford Defendants' Statement of Facts ("Pl. Resp. to DSOF") [279]; Wexford Defendants' Response to Plaintiff's Statement of Additional Material Facts [296].").

[3]     Dr. Gourguechon is a board-certified psychiatrist. She is currently a faculty member at the Feinberg School of Medicine at Northwestern University, where she supervises psychiatry residents. She previously served as President of the American Psychoanalytic Association. (Gourguechon Rep. [280-2] at 2.)

lack of attention to detail, difficulty focusing, failing to complete tasks, forgetfulness, procrastination, and impulsivity.  (*Id.* at 7–8, 16.)  Plaintiff claims to have been diagnosed with ADHD as a child—although there is no record of this—and was given Adderall (without a prescription) by family members because "they couldn't tolerate the hyperactivity."  (Pl. Dep. [265-1] at 73:6–17.)

At some point (exactly when is unclear), Plaintiff was transferred to Menard Correctional Center, where Plaintiff continued to receive Wellbutrin.  (PSOF [280] ¶ 8.)  In summer 2018, a conflict with a supervisor resulted in loss of Plaintiff's prison job.  (*Id.* ¶ 9.)  Jones then had a "serious depressive episode," and stopped taking Wellbutrin.  (*Id.*)  Subsequently, on August 30, 2018, and September 19, 2018, Jones attempted suicide by hanging.  (*Id.*)  Jones was then prescribed emergency doses of the drugs Haldol, Ativan, and Benadryl by Dr. Floreani, a psychiatrist at the prison.  (DSOF [265] ¶ 9*.*)  On October 23, 2018, Dr. Floreani began to reconsider Plaintiff's diagnosis:  Dr. Floreani noted that Plaintiff's "presentation over time" and "persistent irritability with agitation and noncompliance with treatment" suggested that Plaintiff had bipolar disorder.  (IDOC Medical Records [265-2] at 18, 22.)  The doctor updated Plaintiff's diagnosis to "unspecified bipolar disorder."  (*Id.* at 22; DSOF [265] ¶ 10.)  She noted that Plaintiff had been prescribed Zyprexa, a drug used to treat bipolar disorder, but had refused to take it. (DSOF [265] ¶ 10.)

A few days later, on October 26, 2019, Plaintiff was transferred to Dixon Correctional Center because Plaintiff "would more likely get help there" relative to Menard.  (Pl. Dep. [265-1] at 24:21–25:2.)

### B. Dixon Correctional Center

At Dixon, Plaintiff was placed in the prison's "Special Treatment Center ('STC') for patients with serious mental health issues."  (DSOF [265] ¶ 11.)  Plaintiff remained at Dixon for almost two and a half years, from October 2018 to April 2021.  The events of Plaintiff's stint at Dixon are

3

recounted primarily in contemporaneous medical records and provider notes written by psychiatric staff at the prison.

On October 29, 2019, shortly after arriving at Dixon, Plaintiff met for the first time with Defendant Jennifer Hoffman, a nurse practitioner at the STC.  The meeting was contentious—NP Hoffman reported that Plaintiff was "triggered," "angry," and "snappy," primarily due to Hoffman's refusal to refer to Plaintiff as "Innocent Man."  (*Id.* ¶ 12; *see also* Pl. Resp. to DSOF [279] ¶ 12.) According to her notes, Plaintiff was "adamant" that Dr. Floreani was wrong about the bipolar disorder diagnosis, that Plaintiff actually had ADHD, and that Plaintiff required treatment to alleviate ADHD symptoms.  (DSOF [265] ¶ 13.)

On October 30, 2019, Hoffman submitted a letter to the Dixon Treatment Review Committee ("TRC"), recommending that Plaintiff be placed on enforced medication for bipolar disorder.  (*Id.* ¶ 15.)  Here, the court pauses to describe the treatment review process at IDOC. During the relevant time period, medical treatment at Illinois prisons was provided by Defendant Wexford Health Sources, Inc. ("Wexford"), under a contract with IDOC.  (*Id.* ¶ 4.)  Pursuant to 20 ILL. ADMIN. CODE § 415.70, Wexford providers can request that psychiatric patients be forced to take psychotropic medications when enforced medication is in the best interest of a prisoner who poses a threat to themselves or others.  *See id.* § 415.70(a)(1)(A) (outlining the criteria).  Non-emergent medication requests are reviewed by a "Treatment Review Committee," which consists of "two mental health providers and a physician" appointed by the prison's Chief Administrative Officer.  (DSOF [265] ¶ 6 (uncontested in relevant part).)  If the TRC approves enforced medication, the prisoner may request a "periodic review every six months."  (*Id.* ¶ 8.)  It is not entirely clear how prisoners are forced to take their medications, but Defendants suggest that "intramuscular injection" is used in at least some circumstances.  (*Id.* ¶ 5.)

On November 1, 2018, while Hoffman's enforced medication request was pending, Plaintiff met with Defendant Dr. Ramon Marquez, a practicing psychiatrist at Dixon who was assigned to treat Plaintiff.  (*Id.* ¶ 16.)  Plaintiff, again, demanded to be referred to as "Innocent

4

Man." (PSOF [280] ¶ 13.) The details of this meeting are disputed. As Defendants read Dr. Marquez's notes, they show that Plaintiff relayed facts about Plaintiff's family and past psychiatric history that were inconsistent, suggesting Plaintiff was attempting to get prescriptions for Adderall and Wellbutrin—two drugs often abused by prisoners. (DSOF [265] ¶ 17; PSOF [280] ¶ 13.) For example, according to Dr. Marquez, Plaintiff claimed Plaintiff's father had ADHD, but also that Plaintiff does not know who Plaintiff's father is. (PSOF [280] ¶ 13.) Plaintiff tells a different story— Plaintiff claims the meeting was "really weird," and that Plaintiff was falsely accused of being a "sociopathic" "malingering closeted junkie looking to drug seek." (PSOF [280] ¶ 13.) Plaintiff also claims Dr. Marquez "fabricated" the negative notes from the interview, evidently in an effort to erroneously classify "Plaintiff as drug seeking." (Pl. Resp. to DSOF [279] ¶ 19.) Plaintiff does not contest Dr. Marquez's assessment of Plaintiff as "not compliant with his prescribed Haldol and Cogentin." (*Id.*)

On November 7, the TRC "held a hearing regarding NP Hoffman's request to have Plaintiff placed on involuntary / enforced medication status." (DSOF [265] ¶ 21.) Plaintiff appeared at the hearing, accused the doctors of misinterpreting Plaintiff's mental health conditions, and claimed Plaintiff suffered from ADHD. (*Id.* ¶ 22.) The TRC ultimately declined to enforce medication, but placed Plaintiff on thirty-day monitoring for self-harm. (*Id.* ¶ 23.) Later that day, Plaintiff requested that NP Hoffman remove the crisis watch monitoring, and Hoffman did so. (DSOF [265] ¶ 24; Pl. Resp. to DSOF ¶ 24.)

About a month later, on December 8, 2018, Plaintiff again met with Dr. Marquez. Dr. Marquez wrote in his notes that "Plaintiff 'continues to demand Wellbutrin and that he had ADHD. He has tons of bogus reasons and is savvy regarding psychopharmacology. That is why I will continue to refuse his request as he seems to be reading from a familiar script used by inmates who divert and abuse Wellbutrin.'" (PSOF [280] ¶ 15.) Plaintiff continued to refuse to take his medicine, so Marquez offered to end Plaintiff's Haldol prescription, and replace it with an "alternative treatment for depression" that consisted of Cymbalta, Prozac, and Abilify. (DSOF

[265] ¶ 26.)

Plaintiff was evidently dissatisfied with Dr. Marquez's plan and refused to cooperate with the patient care team for several months. On January 26, 2019, NP Hoffman tried to schedule a "routine follow-up" with Plaintiff, but Plaintiff refused to meet. (*Id.* ¶ 28.) On March 13, 2019, Dr. Marquez did meet with Plaintiff; he noted that Plaintiff claimed to be depressed, had trouble concentrating, and "could not motivate himself to be productive." (*Id.* ¶ 29.) Plaintiff demanded treatment for ADHD and depression, but Dr. Marquez observed that Plaintiff remained "very resistant to all treatment" options that were offered. (Pl. Resp. to DSOF [279] ¶ 29; DSOF [265] ¶ 29.) When Dr. Marquez attempted to meet with Plaintiff three days later for a follow-up, Plaintiff refused to meet with the doctor. (DSOF [265] ¶ 30.) Marquez nevertheless decided to continue Plaintiff's course of Prozac and Cymbalta, and planned to "continue to prescribe alternative treatments and continue to try and meet" with Plaintiff. (DSOF [265] ¶¶ 31–32.) Marquez noted that Plaintiff's ADHD symptoms had not been observed by prison staff, and to the contrary, Plaintiff had engaged in other behaviors (such as playing chess) that suggested Plaintiff did not, in fact, have ADHD. (*Id.* ¶ 31.) In total, Dr. Marquez attempted to meet with Plaintiff four additional times over the summer of 2019—on May 23, June 7, July 13, and August 30—but Plaintiff refused each time. (DSOF [265] ¶ 33.)

Plaintiff's care team finally broke through on September 3, 2019, when Plaintiff met with NP Hoffman and complained that Cymbalta and Prozac were causing Plaintiff erectile dysfunction. (*Id.* ¶ 34.) Plaintiff requested Trazadone, another antidepressant, and NP Hoffman agreed to replace Cymbalta and Prozac (prescribed for Plaintiff, but which Plaintiff had not been taking) in favor of Trazadone. (*Id.* ¶¶ 34–35.) About a week later, on September 13, 2019, Dr. Mark Fischer, another psychiatrist at the prison, met with Plaintiff. Dr. Fischer recommended that Plaintiff resume taking "Cymbalta—a selective serotonin and norepinephrine reuptake inhibitor (SSNRI) depressant—with his Trazodone." (*Id.* ¶ 37.) Dr. Fischer did prescribe Cymbalta, though the notes do not make clear whether Plaintiff agreed to this course of treatment. (*See* IDOC

6

Medical Notes [265-3] at 70.)

On October 11, 2019, Plaintiff agreed to see Dr. Marquez for a follow-up appointment. (DSOF [265] ¶¶ 39–40.)  Notes from the meeting suggest that Plaintiff continued to disagree with Dr. Marquez about the appropriate diagnosis and medications:

> 34 y/o AAM who agrees to see me after refusing my visits for over 6 months.  He remains highly offended over my initial impressions of his behavior upon his arrival. He continues to insist that he has ADHD and that it requires treatment with wellbutrin only.  It was very difficult for him to contain his frustration towards me and he had to deescalate himself several times during the interview.  He allowed me time to explain my impressions of him but disagreed and continued to challenge me and accused me of being inexperienced, biased, and continuing a narrative started by another psychiatrist at previous prison.  We argued our points and did not come to an agreement other than that I knew he suffered from mental illness and that he merited a second review and perhaps a revision of my initial impressions as well as agreed to continue communicating.

(IDOC Medical Notes [265-3] at 72.)  Dr. Marquez also noted that Plaintiff's compliance with Plaintiff's prescribed Trazadone and Cymbalta was "inconsistent."  (DSOF [265] ¶ 40.)

On November 9, 2019, Dr. Marquez met with Plaintiff for another follow-up appointment. Plaintiff refused to meet privately, so the two met in the prison's day room.  (*Id.* ¶ 42.)  Plaintiff, once again, demanded specific medications; Dr. Marquez offered lithium as an alternative.  (*Id.* ¶¶ 42–43.)  Plaintiff became angry, and Dr. Marquez ended the meeting when Plaintiff began to yell and swear at him.[4]  (*Id.*)  On December 12, 2019, a follow-up Treatment Review Committee hearing was conducted, and the TRC ultimately discerned that "there was a substantial risk" that Plaintiff would self-harm and decided to move forward with enforced Haldol.  (*Id.* ¶¶ 48–49)

Dr. Marquez did not meet with Plaintiff again for several months—his notes suggest that Plaintiff refused "3-4 appointments," on dates that do not appear in the record.  (IDOC Medical Notes [265-3] at 84.)  When Plaintiff next agreed to meet with Dr. Marquez on February 1, 2020, Plaintiff complained that the enforced Haldol was causing erectile dysfunction and general malaise.  (DSOF [265] ¶ 50.)  Dr. Marquez agreed to replace Haldol with enforced Abilify, a "more

---

[4]     This lawsuit was filed soon after this meeting, on November 18, 2019.  (*See* Compl. [1].)

metabolically-friendly mood stabilizer and one with less side effects." (*Id.* ¶ 51; *see also id.* ¶ 54 (noting that Abilify was also enforced).)  Dr. Marquez noted that Plaintiff displayed no signs of "extrapyramidal symptoms" ("EPS") (like muscle twitches) that can be side effects of Haldol.  (*Id.* ¶ 50.)  At a February 29, 2020 follow-up visit, Plaintiff reported to Dr. Marquez that erectile dysfunction had continued to be a problem even after the switch to Abilify.  (*Id.* ¶ 52.)  Dr. Marquez observed that Plaintiff "had only been on Abilify for a few weeks" and asked whether there had been any amelioration of the sexual side effects, but Plaintiff again stated that the only drug he desired was Wellbutrin.  (*Id.* ¶ 53–54.)  Dr. Marquez decided to request a Wellbutrin prescription, but for depression—not ADHD.  (*Id.* ¶ 54.)

Wellbutrin access at the prison is tightly controlled, because the drug is "well known to be a highly sought out medication to be abused in prison."  (PSOF [280] ¶ 7.)  The drug is not on Wexford's formulary, meaning that providers like Dr. Marquez must request permission from Wexford's Regional Psychiatrist prior to prescribing it.  (*Id.*; *see also* DSOF [265] ¶ 95.)  If Wexford denies the prescription request, the provider can internally appeal, all the way up to the IDOC Chief of Psychiatry.  (DSOF [265] ¶ 95; Pl. Resp. to DSOF [279] ¶ 95.)

Dr. Marquez's February 29 Wellbutrin request was, at first, denied by Wexford for reasons not clear from the record, and Dr. Marquez appealed the decision.  (PSOF [280] ¶ 26; DSOF [265] ¶ 57.)  Dr. Scott McCormick, Wexford's regional psychiatrist, emailed Dr. Marquez to request more information, but Dr. Marquez (who says he was ill at the time) did not immediately respond, and the appeal was ultimately denied.  (PSOF [280] ¶ 26; Defs. Resp. to PSOF [296] ¶ 26; DSOF [265] ¶ 57.)

On March 20, 2020, Dr. Marquez noted that Plaintiff "refused to meet for tx [treatment] plan session."  (IDOC Medical Notes [265-3] at 94.)  Notes from this date also show that Plaintiff had been prescribed enforced Zyprexa, a treatment for bipolar disorder—but the record is silent on when this prescription was written, who prescribed it, or when the TRC approved the decision

to enforce the medication.[5] (PSOF [280] ¶ 25; DSOF [265] ¶ 56.) As Dr. Gourguechon explained, Zyprexa (evidently like Haldol) can cause side effects known as "extrapyramidal symptoms", such as tremors or facial twitches. (Gourguechon Rep. [280-2] at 7.) Dr. Marquez noted that he did not observe any such symptoms (DSOF [265] ¶¶ 50, 57, 59), but Dr. Gourguechon believes Plaintiff did have EPS during his time at Dixon, and that the symptoms are likely permanent. (Gourguechon Rep. [280-2] at 7.)

On May 7, Plaintiff had yet another appointment with Dr. Marquez. (DSOF [265] ¶ 57.) According to his notes, Plaintiff was extremely non-cooperative. (*Id.*) Plaintiff "scream[ed] at Dr. Marquez to leave him alone," using profane language. Plaintiff reported that medications "made him more suicidal," and Dr. Marquez responded by suggesting additional medications to target suicidality, noting that Plaintiff had not been taking many of his existing medications. (*Id.* ¶ 58.) In response, Plaintiff "began yelling," and claimed to have extrapyramidal symptoms. (*Id.* ¶¶ 58– 59.) Dr. Marquez decided to start Plaintiff on "lithium therapy" for depression and suicidal thoughts. (*Id.* ¶ 59.)

On May 21, the two met again. Dr. Marquez noted that Plaintiff was taking Plaintiff's enforced medications, and that Plaintiff's compliance with "community and [] mental health sessions" at the prison was "good." (DSOF [265] ¶ 60.) But later that day, Plaintiff believed someone had stolen something from his cell; he became angry, punched a wall, and was placed on crisis watch. (*Id.* ¶ 61.) The next day, on May 22, NP Hoffman met with Plaintiff for a crisis watch assessment, and noted that Plaintiff denied hallucinations, delusions, or any symptoms of mania. (*Id.* ¶ 61.) Plaintiff was removed from crisis watch on May 25. (*Id.* ¶ 64.)

On June 20, 2020, Dr. Marquez attempted to meet with Plaintiff, but he refused. Marquez noted that Plaintiff was only taking his enforced medications, and not lithium. (DSOF [265] ¶ 65.) Marquez also observed that Plaintiff had become less aggressive with prison staff, and more

---

[5] Defendants deny that Dr. Marquez wrote the prescription for Zyprexa, but they do not state who actually prescribed the drug. (Defs. Resp. to PSOF [296] ¶ 25.)

cooperative, since he began taking Zyprexa. (*Id.* ¶ 66.) On July 17, 2020, Dr. Marquez "saw Plaintiff to update his mental health treatment plan." (*Id.* ¶ 67.) Plaintiff complained of his enforced medications, and noted that he wished to appeal his "enforced Zyprexa" to the Treatment Review Committee. (*Id.*) On July 22, Dr. Fischer saw Plaintiff, and discontinued Plaintiff's lithium due to non-compliance. (*Id.* ¶ 68.) On August 20, 2020, Dr. Marquez attempted to meet with Plaintiff, but Plaintiff once again refused. (DSOF [265] ¶ 70.)

On September 3, 2020, the TRC held a hearing on Plaintiff's enforced Zyprexa. Plaintiff admitted that Plaintiff had been finding ways to avoid taking the medication, despite it being enforced. (*Id.* ¶ 73.) Plaintiff also complained of unspecified side effects. (TRC Hearing Summary [280-20] at 2.) The Committee ultimately determined that "Jones does not appear to be a danger to himself or others and appears to be capable of caring for his basic needs." (*Id.* at 3.) They voted to discontinue enforced medication. (DSOF [265] ¶ 73.)

Some time later in September, Plaintiff sent a message to prison staff inquiring about the possibility of physician-assisted suicide in Illinois. (DSOF ¶ 74.) Plaintiff was again placed on crisis watch, and NP Hoffman saw Plaintiff on September 16 for a crisis watch assessment. (*Id.*) Hoffman noted she "was leaning towards submitting" a renewed request for enforced Zyprexa, since it appeared Plaintiff's condition had deteriorated once the TRC agreed to stop enforcing the drug. (*Id.* ¶ 75.) Hoffman further noted that Plaintiff was "on no medications at that time." (*Id.*) Plaintiff was removed from crisis watch on September 21, 2020. (*Id.* ¶ 76.) Dr. Marquez attempted to meet with Plaintiff on October 2, but Plaintiff again refused the appointment. (DSOF [265] ¶ 77.) Dr. Marquez speculated that Plaintiff's "inquiry" regarding assisted suicide "may have been staged." (*Id.* (cleaned up).)

On October 21, 2020, Plaintiff wrote a letter to prison staff professing suicidal thoughts, and was again placed on crisis watch. (DSOF [265] ¶ 79.) Plaintiff again met with NP Hoffman, complained of being placed on a crisis watch, and denied any desire to commit self-harm. (*Id.* ¶ 79.) Instead, Plaintiff reported concerns that prison staff were refusing to treat Plaintiff for ADHD

10

and depression; notably, Plaintiff also reported post-traumatic stress disorder ("PTSD") and gender incongruity. (*Id.* ¶ 79.) The crisis watch was discontinued on October 23. (*Id.* ¶ 80.)

On November 6, 2020, Dr. Marquez again tried to meet with Plaintiff, but Plaintiff refused. (DSOF [265] ¶ 81.) At this time, Plaintiff was taking no medications at all. (*Id.*) There is no evidence of Dr. Marquez attempting to meet with Plaintiff after this date. Dr. Marquez testified that at this point near the end of Plaintiff's stay at Dixon, the "patient was completely refusing to see me." (Marquez Dep. [265-5] at 204:23–205:7.) Plaintiff notes that Marquez did not make "a record of attempting to meet" with Plaintiff, but does not deny that Dr. Marquez actually made such attempts. (Pl Resp to DSOF [279] ¶ 81.)

At some point—exactly when is not clear—Plaintiff requested "information regarding the transgender care committee and transfer to a female facility." (IDOC Medical Records [265-3] at 141.) On November 23, 2020, a social worker, Rachel Vasquez, met with Plaintiff at the prison. (PSOF [280] ¶ 35.) There is some dispute between the parties about how transgender patients are treated in Illinois prisons. Both parties agree that "[i]nmates that want gender-affirming treatment . . . must first go through a transgender committee." (DSOF [265] ¶ 96 (undisputed in relevant part).) Defendants further claim that the primary treatment for inmates with gender dysphoria is "handled through the medical unit," not through the "mental health unit," under IDOC regulations. (Wexford Br. [264] at 22.) Plaintiff denies that *all* treatment for gender dysphoria is conducted by the medical unit—apparently because mental health professionals can arrange for individual or group therapy for inmates with gender dysphoria—but does not identify any other forms of non-therapy treatment the mental health unit can offer. (Pl. Resp. to DSOF [279] ¶ 102.) Ms. Vasquez's exact role in the prison is not clear; Dr. Marquez referred to her as a "qualified mental health provider," but did not say whether she is associated with IDOC's transgender care committee, the mental health unit, or the medical unit. (Marquez Aff. [265-3] ¶ 37.)

Regardless, notes from this meeting suggest that Plaintiff expressed an interest in transferring to a female facility due to Plaintiff's claim of bigender identity. (IDOC Medical Records

11

[280-23] at 2.)  Plaintiff claimed to "identif[y] as both a male and female at the same time," but according to Ms. Vasquez's notes, Plaintiff was "unable to describe this further."  (*Id.*)  Plaintiff claimed not to have taken hormones,[6] but expressed "interest[] in Rogain [sic] for hair loss" and and in "taking hormones or having sex reassignment surgery after being transferred" to a different facility.  (*Id.*)  Vasquez concluded that Plaintiff did not "meet the criteria for a diagnosis of gender dysphoria," but did not elaborate any further.  (*Id.*)  Ms. Vasquez died a few months later, and does not appear to have followed up on her meeting with Plaintiff.  (Pl. Dep. [265-1] at 108:5–6.)  On December 21, 2020, Plaintiff met with "J. Taylor" and requested treatment for male pattern baldness because baldness, in Plaintiff's words, would "conflict with my Bi-gender identity."  (PSOF [280] ¶ 36.)  The record is unclear, but the court assumes that Plaintiff was never prescribed this medication.  (*See id.*)

### C.    Joliet Treatment Center

In April 2021, Plaintiff was transferred to the Joliet Treatment Center ("Joliet"), an IDOC facility for persons with mental illness.  Joliet providers, like those at Dixon, initially refused to prescribe Wellbutrin to Plaintiff, ostensibly because of the security risks associated with the drug.  (PSOF [280] ¶ 46.)  In May 2022, however, an unnamed Wexford provider submitted a non-formulary request for Wellbutrin; this time, the request was approved.  (*Id.*)  Plaintiff then began to receive Wellbutrin, and according to Plaintiff, Plaintiff's condition improved.  (DSOF [265] ¶ 87.)  Nonetheless, Plaintiff continues to claim that the providers at Joliet have refused to treat Plaintiff for ADHD—according to Plaintiff, because Joliet has a policy of providing ADHD medication only to inmates participating "in a school program."[7]  (PSOF [280] ¶ 44.)

---

[6]    This is somewhat at odds with Plaintiff's deposition testimony, where Plaintiff claimed to have tried hormonal replacement therapy prior to incarceration, but claimed it made Plaintiff feel "loopy."  (*Id.*)

[7]    Wexford contends its policy for treating ADHD is more nuanced. Wexford explains that "medications may be indicated for ADHD if the patient's condition impairs a patient's functioning, such as in a classroom setting; otherwise the medications are unnecessary . . . many

Also at Joliet, Plaintiff was diagnosed with gender dysphoria on at least two occasions, in April 2022 and March 2023. (PSOF [280] ¶ 49.) While Plaintiff received little treatment for the condition, Plaintiff has not submitted evidence of any requests for gender-affirming care. (*See Id.*) At most, Plaintiff refers to a request for Finasteride (a medication used to treat male pattern baldness), but Wexford denied this request, noting that the drug is "cosmetic." (*Id.*) Plaintiff acknowledges that Plaintiff was offered other forms of gender-affirming care (such as hormone treatment), but declined, as Plaintiff is uncomfortable "publicly identifying as transgender" at the Joliet facility. (*Id.*) On September 19, 2024, Plaintiff's gender dysphoria diagnosis was removed because at that time "Plaintiff did not want gender reassignment surgery or hormone therapy."[8] (*Id.* ¶ 50.)

## II.    Procedural History

On November 18, 2019, Jones filed this lawsuit *pro se* in the Southern District of Illinois. The sweeping Complaint raised numerous claims, ranging from complaints about the grievance process, failure to protect from other inmates, indifference to various medical needs, failure to provide dental treatment, and First Amendment retaliation. (Order [4].) Chief Judge Rosenstengel of the Southern District severed the case, and transferred a portion of Plaintiff's claims to this court. (*Id.*) Judge Reinhard of this court recruited counsel for Plaintiff due to his struggles with mental illness. (Order [41].) After that attorney withdrew due to Rule 11 concerns, Magistrate Judge Schneider recruited alternative counsel.

Plaintiff's operative complaint [98], filed by counsel on December 17, 2021, asserts four

---

inmates at Dixon were simply not enrolled in school and did not have a need for ADHD medications, which are a known security risk in the prison." (Def. Resp. to PSOF [296] ¶ 44.)

[8]    Defendants dispute this characterization—they allege that the gender dysphoria diagnosis was actually removed because Plaintiff did not "meet any of the DSM-5-TR criteria for the condition." (Defs. Resp. to PSOF [296] ¶ 50.) Specifically, Defendants claim Plaintiff (1) had not attempted to make substantial changes in physical appearance; (2) did not demonstrate a "strong desire" to adopt the sex characteristics of another gender; (3) had not requested hormone therapy; (4) stated that Plaintiff did not believe in genders; (5) and had not "reported a strong conviction that he had the typical feelings and reactions of the other gender." (*Id.*)

13

claims under 42 U.S.C. § 1983:  (1) forced use of antipsychotic drugs; (2) deliberate indifference to ADHD; (3) deliberate indifference to depression; and (4) deliberate indifference to gender dysphoria.  Plaintiff also brings a claim of intentional infliction of emotional distress under Illinois tort law.  This complaint names four defendants: Dr. Marquez and NP Hoffman; Wexford Health Sources, Inc., and Catherine Larry, the warden at the Joliet prison against whom Plaintiff seeks injunctive relief.  (Am. Compl. [98] ¶¶ 7–19.)  Defendants moved for summary judgment via two separate motions; both are fully briefed.

## LEGAL STANDARD

Summary judgment is appropriate "if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing FED. R. CIV. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In considering a motion for summary judgment, "the district court must construe all facts and draw all reasonable inferences in favor of the non-movant."  *Srail v. Village of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009).

Once a motion for summary judgment has been properly supported, the opposing party must produce affirmative evidence showing there is more than a "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  An opposing party must produce affirmative evidence raising a genuine issue for trial; they may not rest upon allegations in the pleadings.  *Anderson*, 477 U.S. at 256–57 (1986).  Speculation "cannot create a genuine issue of fact that defeats summary judgment" and "is insufficient to defeat a summary judgment motion."  *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

14

**DISCUSSION**

## I.      Deliberate Indifference

The gravamen of this lawsuit is a federal civil rights claim brought under 42 U.S.C. § 1983, alleging that prison officials were deliberately indifferent to Plaintiff's medical conditions in violation of the Eighth Amendment of the Constitution. The Eighth Amendment protects prisoners in state custody from "cruel and unusual punishments." U.S. CONST. amend. VIII. Because the "unnecessary and wanton infliction of pain" is a cruel and unusual punishment, state governments must provide medical care to prisoners in their custody. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). The Constitution does not require perfect care, however—the failure to treat a condition runs afoul of the Constitution only when it amounts to "deliberate indifference to serious medical needs of prisoners." *Brown v. LaVoie*, 90 F.4th 1206, 1211–12 (7th Cir. 2024) (quoting *Estelle*, 429 U.S. at 104).

Courts evaluating deliberate indifference claims apply a two-step test: (1) the prisoner must have an objectively serious medical condition, and (2) the defendant must be subjectively aware of and consciously disregard that condition. *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The objective element of this test requires a medical condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The subjective element "mirrors the recklessness standard of the criminal law" in that the defendant must have actually known of and ignored a substantial risk to the plaintiff's health; mere negligence or even malpractice is not sufficient. *Brown*, 90 F.4th at 1212. The plaintiff must prove "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the[ir] decision on such judgment." *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 679 (7th Cir. 2023) (citation omitted). This can take the form of either inappropriate care or an "unjustifiable delay" in providing care that "exacerbated the inmate's

15

injury or unnecessarily prolonged his pain." *Id*. (citation omitted).

As explained here, the court concludes that no reasonable jury could find in favor of Plaintiff on any of his claims.

### A. Depression

The court begins with Plaintiff's contention that Defendants were deliberately indifferent to depression. The record, rife with examples of Defendants providing Plaintiff with medical care, defeats this contention: Dr. Marquez and NP Hoffman met with Plaintiff regularly; provided Plaintiff with antidepressants and other drugs in response to complaints of depression; suggested alternative courses of treatment when Plaintiff complained of erectile dysfunction, malaise, and other side effects; and made repeated attempts to establish a rapport with Plaintiff despite Plaintiff's repeated refusals to engage with them. A far cry from deliberate indifference, uncontroverted evidence suggests that IDOC medical providers were reasonably attentive to Plaintiff's mental health needs and sought to see Plaintiff's condition improve.

Plaintiff's argument to the contrary focuses on Defendants' failure to prescribe Plaintiff Wellbutrin, a drug that "Plaintiff made clear . . . was the only medication that had worked for Plaintiff in the past to treat Plaintiff's depression symptoms." (Opp'n [278] at 25.) But as the Seventh Circuit has repeatedly recognized, "the Eighth Amendment does not give prisoners the right to demand specific medical treatment." *Christopher v. Liu*, 861 F. App'x 675, 679–80 (7th Cir. 2021); *see also Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) ("We routinely have rejected claims, however, where a prisoner's claim is based on a preference for one medication over another unless there is evidence of a substantial departure from acceptable professional judgment."). Even taken in the light most favorable to Plaintiff, the record suggests that Dr. Marquez and NP Hoffman hesitated to prescribe Wellbutrin because they worried that Plaintiff would abuse it, and offered Plaintiff numerous alternative medications instead. And undisputed evidence shows that Plaintiff largely refused to take these alternatives because they were not the specific drug that Plaintiff wanted. Plaintiff might have held the sincere belief that Wellbutrin would

16

have alleviated symptoms, but Defendants' failure to prescribe it does not constitute cruel and unusual punishment. *See Williams v. Ortiz*, 937 F.3d 936, 944 (7th Cir. 2019) ("[J]ust because the staff declined to provide him with his desired prescription [] medicine . . . does not mean that the course of treatment was objectively unreasonable.").

### B. ADHD

Next, Plaintiff targets Defendants' failure to diagnose ADHD. (Opp'n [278] at 22–23.) The court disagrees that Defendants violated the Constitution in this regard, for two reasons.

First, it is not clear that evidence supports a finding that Plaintiff's ADHD symptoms constitute a serious medical condition. The only evidence of such symptoms are Plaintiff's own vague complaints of restlessness, difficulty concentrating, and trouble focusing; there is no evidence that these symptoms have actually interfered with Plaintiff's daily life in the prison. (*E.g.*, DSOF [265] ¶ 31). The Eighth Amendment does not compel a prison to medicate every prisoner who makes vague complaints of difficulty focusing, in light of concerns that ADHD medications (like Adderall or Ritalin) are easily abused.[9] Defendants explain that "Wexford's policy is to only allow for the prescription of ADHD medication when the imprisoned person (i) is in a school program and (ii) has documented impaired classroom performance despite good effort." (PSOF [280] ¶ 40.) The court does not believe this policy violates the Constitution and notes that Plaintiff himself presents no authority for a contention that failure to treat attention deficiency constitutes cruel and unusual punishment. (Opp'n [278] at 22–25.)

Second, Defendants *did* consider Plaintiff's symptoms, and concluded that Plaintiff suffered from bipolar disorder and depression—not ADHD. (*See* DSOF [265] ¶¶ 12–19.) This

---

[9] For example, the FDA has noted that Adderall "has a high potential for abuse and misuse, which can lead to the development of a substance abuse disorder, including addiction. Misuse and abuse . . . can result in overdose and death." *Adderall*, U.S. Food & Drug Admin., https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/011522s045lbl.pdf (last accessed March 18, 2026).

17

constitutes an exercise of medical judgment that is entitled to the court's deference.[10]  *See, e.g.*, *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (a medical professional is "entitled to deference in treatment decisions unless 'no minimally competent medical professional would have so responded under these circumstances' " (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir.1998)).  Plaintiff clearly disagrees with this diagnosis, but if Plaintiff is indeed correct and the diagnosis was wrong, a mistaken diagnosis, without more, does not rise to the level of deliberate indifference.  *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) ("[M]edical malpractice "does not become a constitutional violation merely because the victim is a prisoner." (quoting *Estelle*, 429 U.S. at 106)); *see also Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003) (a prisoner's "disagreement with medical professionals about his needs . . . does not state a cognizable Eighth Amendment claim").  Recall that deliberate indifference is a demanding standard: a prisoner cannot survive summary judgment simply by putting forward evidence of a doctor's negligence, or even gross negligence.  *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009).  Rather, the evidence must support a jury funding of "something approaching a *total unconcern* for the prisoner's welfare in the face of serious risks."  *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brown*, 670 F.3d 816, 821 (7th Cir. 2012)) (emphasis added).  The evidence of Defendants' extensive effort to help Plaintiff defeats any such finding.[11]

---

[10]      Plaintiff claims that this is "not an issue of clinical judgment" because Defendants entirely failed to "meaningfully and objectively evaluate Plaintiff for ADHD," despite Plaintiff's demands for the same.  (Opp'n [278] at 22–23.)  The court disagrees.  As the Seventh Circuit once observed, there are several kinds of deliberate indifference cases, including those where the prisoner's "condition was ignored entirely," as well as those where a prisoner was treated, but received a "constitutionally deficient" level of care.  *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019).  Plaintiff's apparent belief that Plaintiff's own claim is in the former category is unpersuasive in light of the extensive mental healthcare Plaintiff received in prison.  The crux of Plaintiff's claim is that Defendants erred by diagnosing Plaintiff with bipolar disorder and depression—not that Plaintiff's symptoms were entirely ignored.

[11]      Plaintiff points to the testimony of the expert witness, Dr. Gourguechon, who opined that Plaintiff has ADHD and should have been diagnosed with it in prison.  (Gourguechon Rep. [280-2] at 7–8.)  This is not enough to survive summary judgment because disagreement

Plaintiff also asserts that Defendants should have reconsidered their diagnosis in light of the fact that their existing treatments were "ineffective"; in support, Plaintiff cites cases holding that doctors' refusal to reconsider courses of treatment despite failed results can constitute deliberate indifference. (Opp'n [278] at 24 (citing *Greeno*, 414 F.3d at 654–55, and *Petties*, 836 F.3d at 730).) Those cases are distinguishable. Defendants are correct that choosing "an 'easier and less efficacious treatment' without exercising professional judgment" can "constitute deliberate indifference," *Petties*, 836 F.3d at 730 (quoting *Estelle*, 429 U.S. at 104 n.10), but the evidence here is that providers proposed many treatment options, and Plaintiff often refused to cooperate. *Contrast* DSOF [265] ¶¶ 28, 30, 32, 45, 52, 65 (providers offered many treatment options, but patient refused to take medications and frequently refused to meet with providers), *with Greeno*, 414 F.3d at 649, 655 (doctor treated vomiting and severe pain with antacids for three years despite no evidence patient's condition was improving). It is not at all clear that Plaintiff's providers refused to consider alternative courses of treatment. What is clear is that Plaintiff most often refused alternative treatments offered by providers and in repeated instances refused to meet with providers at all.

Effectively, Plaintiff (1) complained of mental health struggles, (2) was diagnosed with a mental illness, (3) was provided with medications that doctors believed would address Plaintiff's symptoms, (3) refused to take those medications, (4) and now claims that Dr. Marquez's failure to diagnose a different mental illness and provide Plaintiff with an option that Plaintiff would accept somehow constitutes deliberate indifference on Dr. Marquez's part. The court declines to adopt this reasoning. As noted above, a prisoner is not entitled to the precise treatments they desire, *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (inmates "are not entitled to receive unqualified access to healthcare" (internal quotations omitted)), and a prisoner cannot construct

---

among physicians about the best diagnosis does not without more support an inference of deliberate indifference. *See Lockett*, 937 F.3d at 1024 (requiring "evidence of a *substantial* departure from acceptable professional judgment" (emphasis in original).)

a deliberate indifference claim by refusing to cooperate with prison doctors, *Blankenship v. Birch*, 590 F. App'x 629, 633 (7th Cir. 2014) ("[W]hen a prisoner chooses not to receive treatment . . . the doctor is not deliberately indifferent.").

### C.  Gender Dysphoria

Plaintiff also alleges that Defendants failed to treat Plaintiff for gender dysphoria. Gender dysphoria is a serious medical condition,[12] but Plaintiff's claim fails because there is no evidence Defendants were deliberately indifferent to the condition. First, as to Dr. Marquez, there is no evidence that he was aware of Plaintiff's gender dysphoria during his time treating Plaintiff. Plaintiff claims that Dr. Marquez admitted that he was subjectively aware of Plaintiff's gender dysphoria (PSOF [280] ¶ 34), but that is misleading, as what Dr. Marquez actually said was that he "wasn't aware at the time I was treating him" and only became aware after having "discovered" that Plaintiff had "submitted" "medical records" and had "spoken to a mental health counselor," evidently Ms. Vasquez, about gender dysphoria. (Marquez Dep. [265-5] at 204:4–13.) Dr. Marquez further testified that he planned to "inquire further about this diagnosis," but was thwarted by Plaintiff's refusal to meet with him. (*Id.* at 204:23–205:11.) Plaintiff also claims that Dr. Marquez *should* have been aware of Plaintiff's gender dysphoria, pointing primarily to Plaintiff's request to be referred to as "Innocent Man" instead of "Mr. Jones" or "Sir." But Plaintiff's demand to be referred to as "Innocent Man" is not even remotely suggestive of gender dysphoria, as Plaintiff is a biological male, and the word "Man" is suggestive of a male gender. Ultimately, there is simply not enough evidence for a reasonable jury to infer that Dr. Marquez was deliberately indifferent to Plaintiff's gender dysphoria.

The same applies to NP Hoffman. It is true, as Plaintiff points out, that Plaintiff reported "gender incongruity" during a crisis watch check-in, but NP Hoffman did nothing in response.

---

[12]  Defendants do not argue otherwise. Many courts have recognized that a prisoner's claims of gender dysphoria can give rise to a deliberate indifference claim whenever prison officials fail to provide care. *Meriwether v. Faulkner*, 821 F.2d 408, 412 (7th Cir. 1987); *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (collecting cases).

(Opp'n [278] at 26–27.)  During her deposition, Hoffman explained that her visit was limited to evaluating Plaintiff during crisis watch, and thus she felt looking into or evaluating gender incongruence at that time would have been inappropriate.  (Hoffman Dep. [265-4] at 180:15–18.) NP Hoffman arguably could have been more proactive, but this omission does not rise to the level of deliberate indifference.  Liability for deliberate indifference arises when a prisoner is denied medical care, and Plaintiff has not presented evidence of the treatment Plaintiff should have received, but did not, due to Hoffman's inaction.  Plaintiff claims Hoffman had a duty to "address" and "treat" Plaintiff's gender incongruity, but Hoffman is a psychiatric nurse practitioner who, according to Defendants, was limited in her ability to provide healthcare to gender-nonconforming inmates.  Plaintiff agrees that IDOC's transgender committee is primarily responsible for handling requests for gender affirming care, but nevertheless responds that NP Hoffman should have provided Plaintiff with psychotherapy.[13]  This alone is not enough to support a deliberate indifference claim, especially in light of Plaintiff's testimony that group therapy sessions were offered "like every day" at the prison.  (Pl. Dep. [265-1] at 113:3–8.)

### D.     Enforced Antipsychotic Medications

Finally, Plaintiff targets Defendants' involvement in forcing Plaintiff to take psychiatric medications.  Specifically, Plaintiff accuses Defendants of falsely creating "their own basis for prescribing the antipsychotics due to their own personal animus toward Plaintiff."  (Opp'n [278] at 19.)  Plaintiff's complaint adopts a more general theory, broadly claiming that Defendants "have been and continue to be deliberately indifferent to the substantial risk of harm [Plaintiff] faces from the use of antipsychotic drugs."  (Am. Compl. [98] ¶ 137.)  Both theories miss the mark.

As to the first, there is no evidence that Dr. Marquez and NP Hoffman fabricated medical records or falsely requested enforced medication out of some malicious effort to harm Plaintiff.

---

[13]     The court observes that it does not appear that Plaintiff even desired treatment for gender dysphoria, as Plaintiff now acknowledges "not want[ing] gender reassignment surgery or hormone therapy."  (PSOF [280] ¶ 50.)

Plaintiff's brief instead focuses on the standard of care: it claims that "Defendants breached the standard of care" by forcing Plaintiff to take medications based on "past self-harm rather than on any present risk or grave disability," and attacks NP Hoffman for "run[ning] afoul of IDOC criteria for prescribing enforced medication." (Opp'n [278] at 19–20.) But that is not deliberate indifference. Deliberate indifference is a high bar—it is established only when a physician's decisions are "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). Defendants made repeated efforts to care for Plaintiff. They were not deliberately indifferent to Plaintiff's mental health conditions. And Plaintiff's references to the standard of care smacks of negligence or medical malpractice; again, medical malpractice does not offend the Constitution. *Brown*, 38 F.4th at 550.

As to the second theory: there is no evidence that Defendants ignored the side effects of Plaintiff's enforced medications. To the contrary, there is uncontroverted evidence that Dr. Marquez *did* switch the medication that was enforced—from Haldol to Abilify—in response to Plaintiff's complaints of erectile dysfunction and malaise. To be sure, Plaintiff stated that impotence problem continued even on Abilify (IDOC Medical Records [265-3] at 88), and Dr. Marquez kept Plaintiff on the drug regardless—but Dr. Marquez's decision that the benefits of Abilify outweighed Plaintiff's erectile dysfunction is a reasonable exercise of medical judgment that does not offend the Constitution. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (prison doctors "may choose from a range of acceptable courses" without running afoul of the Eighth Amendment). Likewise, while Plaintiff complained of "increased suicidality and 'extrapyramidal symptoms' " (Opp'n [278] at 21–22), Dr. Marquez did not ignore these complaints—his notes suggest that he examined Plaintiff for these symptoms—and there is no evidence that these determinations rise to the level of total unconcern, or were based on anything other than Dr. Marquez's medical judgment that the drugs would be in Plaintiff's best interest.

## II.     Other Claims

There are two other Defendants in this case: (1) Wexford Health Sources, Inc., the third-party contractor that provides healthcare at IDOC prisons, who is sued pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978); and (2) Catherine Larry, the warden at Joliet Treatment Center against whom Plaintiff seeks injunctive relief.

As to the *Monell* claim, because summary judgment is granted on all underlying constitutional claims, a *Monell* claim against Wexford cannot move forward.  *See Avina v. Bohlen*, 882 F.3d 674, 679 (7th Cir. 2018) (recognizing that there is no *Monell* claim without the aid of an underlying constitutional violation).

And as to claims for injunctive relief, the court has found that Plaintiff's care at the hands of Dr. Marquez and NP Hoffman did not violate the Constitution.  Plaintiff argues that Plaintiff has also suffered mistreatment at Joliet, but the evidence on this is scant.  Plaintiff's brief is almost completely silent on this alleged continued mistreatment (Opp'n [278] at 10, 35–36), and Plaintiff's LR 56.1 statements only mention a few examples:  Specifically, Plaintiff alleges that Joliet has failed to provide ADHD treatment (PSOF [280] ¶ 44), refused to provide particular treatments for gender dysphoria (Plaintiff refused hormones or surgery, but desired Finasteride for male-pattern baldness) (*id.* ¶¶ 49–50), and neglected to give Plaintiff "one-on-one psychotherapy to treat Plaintiff's PTSD" (*id.* ¶ 51).  For the reasons explained above, these circumstances do not appear to violate the constitution and do not support entry of injunctive relief.  Plaintiff suggests that "Plaintiff's care can change at any given moment," (Opp'n [278] at 36), but Plaintiff does not have standing to pursue this speculative concern.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401–02 (2013).

Plaintiff also brings an intentional infliction of emotional distress claim under Illinois law. With all federal claims dismissed from this case, the court relinquishes supplemental jurisdiction over the remaining state-law tort claim.  *See* 28 U.S.C. § 1367(c)(3); *Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010) ("Normally, when all federal claims are dismissed before trial, the district

23

court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." (quotation marks omitted)).

## CONCLUSION

Defendants' motions [263, 267] for summary judgment are granted with respect to all federal law claims. Plaintiff's remaining state law claim is dismissed without prejudice to renewal in state court. The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff.

ENTER:

Dated: March 19, 2026

REBECCA R. PALLMEYER
United States District Judge

24